Okay, Mr. Peterson. Thank you, your honors. Good afternoon. My name is Ezekiel Peterson here on behalf of the United States. With me at council table is Justin Matheny, representing the state of Mississippi. My plan is to speak for eight minutes and to reserve two for rebuttal before turning it over to Mr. Matheny. The district court erred when it held that a municipal utility rate schedule was a federal assistance program under the Food and Nutrition Act of 2008. It thus abused its discretion when it ordered the Mississippi Department of Human Services and the United States to turn over confidential SNAP recipient data to the third-party receiver who is temporarily operating the cities of Jackson's utility. This court should reverse it vacate. I can answer any questions about appellate jurisdiction the court might have, but otherwise I'll plan to jump straight into the meat of the statutory interpretation issue. The text of the Food and Nutrition Act applies a blanket ban on disclosures of SNAP recipient data subject only to limited exceptions, which this court should read narrowly. The exception that we're talking about here is the exception that permits the disclosure of data to administrators of federal assistance programs. That term is not defined in the statute, so the court shouldn't interpret the term according to its ordinary and natural meaning. And the ordinary and natural meaning of a federal assistance program is a program that is authorized by Congress and is administered by the executive branch, not a municipal utility rate schedule. A federal assistance program has to be grounded somehow in federal law. It can't just be any program with any sort of federal nexus. Here the receiver's two arguments as to why his municipal utility rate schedule is actually a federal assistance program are predicated on the two different ways that he interacts with the federal government. First, that he is a court-appointed receiver appointed by a federal court, and second, that he receives federal funding. But both these arguments are wrong. Fundamentally, his authority to set utility rates flows not from federal law, but rather from the Jackson Municipal Code of Ordinances, section 122-273. He may have been appointed by a federal court, but he's not exercising federal authority. I guess, could you step back a little? Because I agree the focus is on that phrase and how we interpret it, but as you said, there's no definition in the statute. Would you also agree there's no case law anywhere that's instructive? Yes, Your Honor. We haven't found any case law that... That tells us what a federal assistance program is. That's correct. Okay. But there's no dispute here that Jackson, through the receiver, the manager, is getting hundreds of millions of dollars, EPA's Office of Grants, and what's it called? DeBar? Office of Grant and what? I don't know the second part of that. Okay. Okay. But it's the EPA that is sending hundreds of millions of dollars. That sounds like federal assistance to me. Yes. So the federal... Why isn't hundreds of millions of dollars going to this man who administers that money, a federal assistance program? I suppose because there's two levels of this. So the EPA program that disperses grant money to the receiver operating the utility may very well be a federal assistance program, but the receiver implementing this rate is totally separate from any sort of federal authority. That's city or local authority that the receiver... I'll stop there because to answer that, I look at the stipulated order, right? And it's very clear there's a whole section on the manager's account, right? The EPA money goes into that account and he's the one who administers the account. So it sounds like he's really in the middle of it, directly connected to what you say may be a federal assistance program, that is the EPA grants. I thought you were going to say all this money, disaster money basically, isn't a program. But you're saying it is a program, it's just he's not directly connected to it when he gets involved in rate setting? Is that the government's position? Yes, Your Honor. I think that's right. When the receiver is using his municipal authority or his local authority to set rates and to try and implement this rate schedule, that rate schedule itself is not a federal assistance program. When I read these conferences, I mean, you, to your credit or attorney, Finger? Mr. Fingerhood. Mr. Fingerhood. Yes. So they're really trying to get this to happen. Yes. And that's commendable. Let's do an opt-in system, whatever. I think that's because everyone knows the receiver's got to transition to the Jackson Water Department. So my point is getting these lower income people to pay something is really critical to ending the federal assistance program. Certainly. So why isn't it all part and parcel of the federal assistance program? That in doing these rates, he's directly connected to protecting EPA's program. I think I see what the disconnect is between what we're talking about. I think, Your Honor, you're assuming that putting the receiver in place and giving the receiver grant money is a federal assistance program. And that we would push back on. So what I was discussing earlier is that the programs by which EPA gives grants to local utilities generally could be potentially federal assistance programs. Although that's not an issue. So if they'd just given it directly to Jackson, Jackson would be able to get this SNAP data? No. No, Your Honor. Sorry. The program that EPA uses to disperse money might be a federal assistance program. I'm not sure. But the utility itself, setting rates, any municipal utility setting rates is not operating a federal assistance program. Even if the setting of the rates is critical to ending the federal program, right? We've got to get the people to start paying instead of EPA and the taxpayers. Even if setting the rates is critical to ending the federal receivership, yes. The setting the rates, that authority comes from municipal law. And the focus is on the program that is being instituted, not who administers the program. Congress could have written a statute that... Just because your time's running out, I think I understand the argument. That's a good point. How exactly, if you were writing this decision, would you draw the rule of law? Yes, there is a federal assistance program that's funding Jackson's water and sewer system. But... But because in setting these rates, the receiver is exercising local authority, his rate schedule is not a federal assistance program. That would be... There's no case for that, but it's just sort of, to be a federal program, you've got to come from Congress and be a law. And instead, this is coming from litigation and the court? Yes, we think that's right. I mean, that's the, we would say, the ordinary and natural meaning of the term federal assistance program. It's authorized by Congress. It's administered by the executive branch somehow. Unless the court has any further questions, I'll turn it over to Mr. Matheny. Well, you've got a minute left. I can always... Okay. Please do. Okay. This is a practical question. Since the government was trying to assist and say, let's do an opt-in, Jackson's response was, they don't trust... We don't have the money to do the reach-outs. Is it true, you must know these federal programs, people that get heat and electricity benefits, they don't... There isn't some automatic qualifying by virtue of being a food stamp recipient? That doesn't exist. You can't make it up, automatic. It's got to be opt-in. Do you see my question? I'm not sure I see your question, but certainly there's a requirement in the Mississippi Code of Regulations that, yeah, there has to be some sort of opt-in for SNAP recipients to have their data disclosed to third parties. So they are consenting. Yes. If you don't have an exception, it's consensual. Yes. Any way to legally and durably implement this program would rely on getting the consent of SNAP recipients. Yeah. Thank you. Okay. If there are no other questions... You've saved time for both. Yes, thank you. Thank you, Your Honors. Mr. Matheny. Good morning, Your Honors, and may it please the Court. If I could, Judge Higginson, I'd like to go straight to this. I think you're right to recognize that at all of these status conferences, in particular the ones that are at issue here, you have the parties struggling to be able to try to find a way to make this work. The reason I think it's important to start with that is that the reason that the State is here, and what's most important to the State, is that this is not done in a way that violates federal law. Because if it does, then the penalties are very harsh. You have 300,000 Mississippians that need their food stamped. Yes, and unfortunately, I even under... I understand those policy arguments, and you're right. Those were in the conferences. The statement, the legal statement in your brief that I'm interested in, is the manager is spending federal money as a participant in a federal program, not administering or enforcing a federal program. Sure. Remember that statement? Yes. What's your authority? Is that a viable distinction? He is participating in a federal program, but he's not administering it, and that's why he can't get the SNAP data? That's part of it. The analysis breaks down like this. I think you have to define federal assistance program. Our view is that that has to be, essentially have to have an act of Congress that establishes the program. We're talking about Medicaid, WIC, those types of programs. Right. Now you're diverging from the government, because the government just said these EPA disaster program help water. Those are federal programs. Those are federal programs. He's participating in it. He's not administering it, and I think that that's where their argument breaks down, because his authority to administrate is the city's authority. We're talking about, you look at the water ISO, the sewer ISO, he's clothed with the city's- With the SNAP exception, the language isn't that he administers, it's that he's directly connected to, correct, or am I wrong? You're talking about 2020- Yeah, the exception that they're asserting. Directly connected with enforcement or administration of- It says enforcement or administration in the statute? I thought it was enforcement in- That would be a big, important piece to your puzzle if it is. To persons directly connected with the administration or enforcement. So he doesn't administer. I understand. No, but the point there being is that the water ISO, the sewer ISO, authorize him to essentially exercise the city's rate power. He's appointed as a receiver under 28 U.S.C. 959. He stands in the shoes of the city. He's exercising the city's power, and that's not what a federal- It's only there by virtue of the federal government bringing this Clean Air Act and the Clean Water Act suit, and then it gets resolved with the consent decree. In the consent decree, it's all about EPA money going through him, through his account, through him. Am I right so far? I think if I'm following you, the consent decree as to the 2012 case, the Clean Water Act order added to that and brought the two together, right? The first order that put the receiver in place was the second lawsuit in 2022, right. Okay. But you're still saying he's working only for the city? I'm saying he is the city. He stands in the city's shoes. I mean, that's what a federal receiver is. He's the city's water department. The city could not operate its water department anymore. It got sued, and the day they filed suit on the second one, the Safe Drinking Water Act case, the district court entered the water ISO and established the third-party manager as the receiver. Before I run out of time, I did want to hit my other Mississippi-specific issues on the sovereign immunity and the personal jurisdiction due process. I think you cut right to this. Their view is that there has been a waiver of the state's sovereign immunity, one by filing the 2012 suit, because the state was a party on that one, and then by participating in the lawsuits after they were consolidated together and so on and so forth through the different agencies. The standard, and this was a really unique sovereign immunity question to find, I think, that the standard here, the principle that we're looking at on the filing of the suit waiver, is from the Caremark case, state waives its immunity only as to compulsory counterclaims. You're looking at claims that arise out of the same transaction or occurrence. State doesn't waive its immunity as to things like permissive counterclaims, which don't meet a same transaction or occurrence test, or are of a different form or nature than the relief sought by the plaintiff. I think that the way that that works here is that state filed a 2012 lawsuit. It was about sewer discharges and events that took place up to 2012, violations of federal and state law. By the time you fast forward 10 years, 11 years, you get to the safe drinking water situation. The state's filing of that suit was not a prospective waiver of the manager being put into place and being able to make essentially a claim against the state for this SNAP data here. As to the participation of the other agencies, I mean, the state's Department of Environmental Quality is participating in the case in order to provide technical assistance, in order to make sure that there's compliance with state law. The State Department of Health is involved in the case because it's in charge of checking the water. The state's Department of Human Services, the welfare agency that runs the SNAP program, has never been involved in the case and took great pains not to get tied up in and involved in the case, appeared at the first status conference via Zoom, didn't respond to the motion, filed a letter. Back on 2020, just what we're trying to interpret, federal assistant programs, when you say SNAP programs run by the state, could you just, the exception applies to federal assistant programs or federal assisted state programs, right? There's a distinction between those two. Just tell me what the distinction is. What's a federal assisted state program? If the state runs SNAP, why isn't this a federal assisted state program? I think the states and the federal government run SNAP. I mean, there's USDA overseas. Those are federal assistance programs. What's an example of a federal assisted state program? A federally assisted state program would be something that, for example, if the Mississippi legislature set up a program and it received federal money and was operated in that manner. But whether it's a direct, directly run federal government program or these cooperative federalism programs that you see so often in EPA context. But these EPA grants, you are saying, to the extent we consider them all, they're federal assistant programs. The big, the hundreds of millions of dollars coming into Jackson for the water sewer, do you agree that is a federal assistance program, but it's just not once it gets involved in rate setting? I think it's the way that he participates in it is what makes the difference. And it's not a federally assisted state program. You can see the distinction there. Last thing real quick, if I could say on the personal jurisdiction point. I mean, really, our personal jurisdiction argument is more like a regular old due process argument. And it relates to the way that the series of events went down where there was a first motion that asked for information from the department. Then that motion was withdrawn. Then they asked for the relief from the government and don't ask for it from the department. And then that shifts by the time you get to the reply brief. Next thing we know, we're hit with an order that says what it says, which is the relevant federal and or state agencies must turn over the SNAP data. That's what we disagree with. That's what we think was a due process violation. And that's the reason for our objection there. All right. You've saved time for a bottle. Thank you, Mr. Matheny. Mr. McGuffey. Please, the court. My name is Mitch McGuffey with my partner, Spencer Ritchie, on behalf of Jackson Water. I'm going to start with there are three issues essentially presented on appeal. I'm going to start with the substantive question on whether or not the district court abused its discretion in exercising its discretionary equitable authority in interpreting the statutory exception to say this is a federal assistance program when the federal receiver is using federal funds, implementing a federal program, and then also extending a 75% discount to federal SNAP beneficiaries. And I'm going to start that discussion, I'd like to, with I think we have a disagreement on the standard overview here. The district court is sitting in equity. He was brought this suit pursuant to the endangerment provisions of the Safe Drinking Water and the Clean Water Acts. He's making a determination in both fact and law. And he's issuing, by their own claims, injunctive relief. As a result, this court reviews for an abuse of discretion. And I'm going to keep coming back to this point. I think it's helpful, if the court will indulge me, to look at the historical context of how we got here. And that is- But stick with the injunctive authority used. Because the first time we have a hearing on it is when the government moves to stay the order, correct? The first time we have a hearing on- In district court. On this SNAP release data. No, Your Honor. The first time I believe this came up, the first time it came up was on our motion. And there were two separate hearings held on that motion. The first, as Mr. Matheny referenced, that the state participated by Zoom. There were six attorneys from- Mr. Fingerhood ran the circus from the government side. But there were also six participating attorneys at that hearing from the state side. From MDEQ, from the Department of Health, and from the Department of Human Services. Then we had a second hearing after the order had issued. And they have a request to stay. But at either of those hearings, or in the order, did the district court ever cite any law to show that his interpretation would be likely to prevail? Is there any case law given by the district judge, either as to receivership authority, but especially as to whether this is a federal assistance program? No, there's no case law as to whether or not this fits as a federal assistance program. Because there is no case law that has ever interpreted the exception that applies in the Food and Nutrition Act. Let me jump ahead to sort of spoil the ending here for me. In the context of a case where the court is exercising its equitable discretion, the Supreme Court has given us a great deal of, and long case law to say, he has a lot of leeway. In the Oakland Cannabis Buyers Cooperative case, it says the federal court is exercising extremely broad equitable authority, and has discretion unless a statute clearly provides otherwise. Prior to that, in the Porter case, the Supreme Court directed, it says, unless a statute by so many words or by a necessary and inescapable reference restricts the court, then he has broad discretion. And they even say that that discretion is even more flexible in character when it's a case of public health, like the one we're dealing with here. And the Supreme Court further warned not to yield those equitable principles unless they're through light inferences or doubtful constructions. You heard the United States. There's no definition in the statute. There's no case law that's ever interpreted. We're almost done here. They have conceded an ambiguity. We pointed to another case from this circuit, U.S. v. Marmalejo, looking at similar terms, federal program and federal assistance. But this is still an interpretation of the statute, which would be de novo review. That is to say, if we were to decide in interpreting the statute that it's not a federal assistance program, then Judge Wingate would not have the discretion to diverge from that. I think I might dispute that. I would say that as a general statement, statutory interpretation is review de novo. That's true. But when the statute is unclear, if there is any ambiguity, the break goes to Judge Wingate, because of how he's sitting and what the equitable authority is that he's operating under. This is not a common situation. This is not a standard statutory interpretation question. This is a court sitting in equity, dealing with a public health crisis and a federal emergency. That it has a certain— That was certainly Judge Wingate's tone. It was, this is my receiver. Government, come up with solutions. Don't be problematic for me. But I still don't understand, the receiver in those final hearings about this said, we don't have a future. We're winding down within a year. Well, that's a quote. We don't have a future. We're transferring to the city public works. I agree with that. Okay, but on your theory, on your theory, would the city public works be able to also continue to use SNAP data? No. No? No. And yet, it's the same EPA money. Well, certainly, if the city were administering, if the federal government said, here, we don't need a federal receiver. City, we're going to give you all this money. Oh, and by the way, we're going to set aside all, that would be a slightly different situation, which is another point that I want to get to. They've claimed, I think repeatedly, that, and I don't mean utility, and that he was operating solely under municipal law. Well, that isn't what the stipulated order says. And that's a stipulated order that was submitted by the federal government, signed by the state of Mississippi, that what the stipulated order says is that they, they call them the ITPM, it's the third party manager, shall have full power and authority necessary to carry out all requirements of this stipulated order. That's one. And two, all powers and authorities under all applicable federal laws, that would include the Safe Drinking Water and the Clean Water Acts, that would include the endangerment provisions within those, within those. The stipulated order doesn't say anything about a federal program. In fact, the only verb I saw that it imposed on him as to EPA was that he consult with them. So that doesn't sound like he's enforcing and administrating. It sounds like he's consulting. I'm sorry, say that again. In the same order you're reading from, to try to suggest that he's running a federal assistance program. EPA is mentioned as someone he has to consult with. Yes. But it isn't, the district court, everyone is acknowledging that his role is he's an officer of the court, not of some federal agency, one, and he's in the shoes of Jackson. So that's again where I'm going to push back. Okay, do it. Everybody says, everybody says he's in the shoes of Jackson. Well, what's fascinating is, you know, the stipulated order says that he takes on, and they've quoted this, assumes all the responsibilities, functions, duties, powers, and authorities of the city insofar as they affect the city's compliance with the stipulated order. The stipulated order goes on to say, and this is in paragraph Q under 6, it's his responsibilities. What does he have to do? One of the things he has to do is he has to submit a financial management plan, because this was never just a problem of the city's water and sewer infrastructure needing to be repaired. This was a financial crisis. The United States actually agrees with that point, and I want to put that in as well, is that in submitting the stipulated order, the United States itself said that Jackson's financial problems were in part the cause of the water failure. And so they say, hey, you've got to give us a financial management plan. You've got to ensure viability of this, of this, of this utility through the short, medium, and long term. And as part of that, it says in reliance on the financial management plan, if the manager deems that a modification of the rate structure is necessary to meet the stipulated orders requirements, then he can unilaterally set the rates without any action by the city. The city council never approved this. The mayor never approved this. This is unilateral work done by the third-party manager because it's necessary to meet the requirements of the stipulated order. And the stipulated order flows directly out of the complaint filed by the United States saying, hey, you're repeatedly violating the safe drinking water. You are both opposing. Councilor is saying utility rate setting is about as local a function as you can get. Sure. And if you can It's got to be done whether there's federal money coming in or not. But my point would be, if they can point me to any Mississippi law or any Jackson City ordinance that permits unilateral rate setting without approval of the city council, essentially without submission of the city council, then I would be interested to read it. The only way he's able to do that is because he's serving as a federal officer under the federal district court's equitable authority. That's the only reason. But that doesn't turn him into a federal assistance program, right? When I'm looking at the order that we're reviewing, Judge Wingate says to resolve this emergency, this court appointed ITPM as an officer of the court to stabilize and manage the city of Jackson's water and sewer systems. So he's appointing him, he, the court's appointing him, no federal agency's paying for him, to do what? To run a local sewer and water program. He's appointing him. I would certainly take issue that no federal agency is paying him. He is the recipient of nearly $800 million, and almost all of his salary is coming directly from the federal government, not from the city of Jackson. So he is administering, there was this hashing out, is he administering, is he spending the money? Administer, manage, potato, potata. Okay? Those two words are pretty interchangeable. So he is certainly taking in federal funds, enormous amounts of federal funds that were appropriated through acts of Congress, that's through ARPA and others, but also done through EPA grants, also done through the United States Army Corps of Engineers, all sorts of sources of federal money being poured into his lap, essentially, because they don't trust the city. He's not sitting in the city's shoes. They would never have handed this money to the city of Jackson. I don't think anybody would dispute that. And so what you have is a person who is managing and administering enormous amounts of federal money, and then he's taking it and saying, hey, if we're really going to fix this system, we're going to fix it. Is the logic of your argument that any time Congress supports disaster relief money, all the FEMA money, post-Katrina, whatever, any person that's actually then dispersing it has access to low-income data in the food? No. So the receivership is crucial to your argument, or not? I think every hook that you have here is crucial to this argument. You had a federal emergency declaration. The stipulated orders and the complaint don't come out of thin air. They were negotiated over the course of that. So I'm asking, if we were to rule your way, how would we distinguish every single time, each wildfire, each flood, everything, whenever the federal money goes in there, those people can all disperse it to low-income people by virtue of this exception? What's the limiting principle? I think one of your limiting principles is, yes, the receivership matters. The court's oversight matters. The activity and the involvement of the EPA and other federal agencies also matter. So you've got the federal emergency. You've got a federal receiver. You have a federal court. You have federal dollars coming in. You have federal beneficiaries receiving this next benefit, right? And you have a stipulated order that specifically requires him to do what he's doing. So that's the federal government who signs off on that stipulated order to say, we need you to do this. But his staff are going to be rolled into this Jackson City and Water Sewer Department. So they get access to this data. Then the city has access to all the data. And that doesn't jeopardize Mississippi's? Absolutely not. So that's one thing I want to take issue with. And that's a question of appellate jurisdiction. And I can move to that. I'd like to touch on some of those things. Before I jump to that, let me round out this. And I do want to point the court to the Marmalejo case. It says, hey, I'm looking at federal program. I'm looking at federal assistance. And this court said, look, there's no definition. Therefore, it's ambiguous. And it says, the defining qualities of federal assistance are unclear. That's the quote from Marmalejo. So in a situation where you've got an undefined, clearly ambiguous term, federal assistance program, and you've got a court sitting in equity, you're touching all these things, federal officer, federal court, federal emergency, operating under federal law, operating with a stipulated order signed by the federal government, and pushing down benefit to a federal class of beneficiaries, that is why the court did not abuse its discretion in coming to that determination. And everything that flows out of that is sort of uninteresting. They take issue with, then he abused his discretion by directing them to send the list. Well, that's not very interesting because the statute, the FNA, specifically requires the state, if it's a federal assistance program, you are required to permit disclosure to that federal assistance, to people operating and administering that program. So I think what I would call the production part of this order is somewhat uninteresting and it's a necessary outflow. If he gets discretion and or he's right, and I think he's right number one, but even if it's questionable whether he's right, if he did not abuse his discretion in reaching that determination, then obviously they have to produce the list. I mean, I think that's one thing I would say. On your question, I think this goes to appellate jurisdiction, this question of what happens if the state gives this list out. Well, the thing that they don't respond to in their brief is something that we raised in ours, which is the state has never pointed to any statutory or regulatory or case law that would say, if this court comes back and says, hey, you know what, Judge Wingate was right and we're going to affirm his determination, this was a federal assistance program. Well, that's the law then. At that point, the FNA requires them to produce the list to people administering a federal program, a federal assistance program. They haven't pointed to anything that would then allow the USDA to say, hey, we still disagree with the Fifth Circuit, so we're going to revoke your SNAP benefits. That's not a real risk. It's a straw man. It sounds really scary. The problem is it's not an actual harm, because if this court affirms or dismisses based on the lack of appellate jurisdiction, then that's it. It's a federal assistance program as declared by United States District or Circuit Court, and that's going to control whether or not they have to produce that list under the FNA. I'll take just a few seconds to say on the issue of appellate jurisdiction, they agree, and we don't dispute, that this is an order directed to a party that provides some of the relief sought in the complaint. So the question is, does every single injunction ever get appellate review under 1292? I think the case law is pretty clear that they have to allege a serious, perhaps irreparable harm, and the primary harm that the United States has named is that it could have a chilling effect on participation in the SNAP program. That's just something that I felt the need to respond to, because they've changed the argument a little bit. In support of that contention in their initial brief, the United States pointed to a statement by the Director of Program Administration of SNAP, who said that disclosure could, that was the word used, could have a chilling effect on SNAP participation rate. We came back and said, that sounds an awful lot like speculation. Could possibly, maybe, reduce the participation. So they took that and said in their reply brief, well, we're going to editorialize our own director and say, quote, unauthorized disclosure of confidential SNAP recipient data would chill SNAP participation rate. That's in their reply at page 6. Not even the director was willing to say what the United States now argues as fact. So the reality is, the F&A already provides for non-consensual disclosure to other federal assistance programs. It's not a unique thing. And we would say that rate beneficiaries getting a 75% discount on clean water might actually encourage them to participate in SNAP. But hey, that's speculation too. The last point I want to make is to touch on Mr. Matheny's point on state jurisdiction. There are two things that the state ignores. And they point back to Karen Mark and they say, hey, this is a compulsory counterclaim issue. That misses the mark because they also say, hey, this is injunctive relief that we had a right to appeal. Well, that's directed to a party and affords relief sought in the complaint. So in one breath, they want to say, hey, you court, you have appellate jurisdiction because this is an injunction. And in the next breath, they want to say, but Judge Wingate didn't have jurisdiction over us even though we're the plaintiff in the underlying case and we're being given some of the relief sought in our complaint. What Karen Mark says in the relevant part is that the state submits and waives its immunity for a complete determination of the issues raised in that complaint. The other case that I would point the court to on this question of jurisdiction is the Fourth Circuit's case last year, the South Carolina Parks and Rec and Tourism. When you have a department, an agency, that waives immunity and here you have two agencies participating in these stipulated orders and one of those agencies is a participant as a plaintiff. When you have agencies that waive, a waiver for one is a waiver for all. Just so I have your underlying rule of law, a federal assistance program exists here even though the ITPM is a creature, an officer of the court, Article III. Yes. Even as to activities that involve local money coming in rather than federal money going out. On the last point, I think I would say yes, because what he's doing is rate setting under the umbrella of the stipulated orders and under the court's equitable discretion. Everything is going to flow out of that. All right. Thank you, Mr. McGuffey. Mr. Peterson for rebuttal. Thank you, Your Honors. I'd like to make just two brief points on rebuttal. First, I want to start by pushing back a little bit on Mr. McGuffey's characterization of the standard of review here. Certainly, we agree that this court reviews a trial court's exercise of its equitable authority for abuse of discretion, but this court has also said in the Hewlett-Packard Co. v. Quanta Storage case that we cited on page 20 of our brief that a misinterpretation of the law or an erroneous interpretation of the law or application of the law to the facts is an abuse of discretion. Really, this boils down to your standard statutory interpretation, de novo review issue. There is no tie goes to the runner rule in statutory interpretation, certainly not after Loper Bright. This is a standard statutory interpretation issue where the court should look at the plain text and the ordinary natural meaning of the plain text and apply that to the— There's a lot of weight on the Marmolejo decision. We don't think the Marmolejo decision is particularly applicable here. I mean, partly, it's interpreting language in a different statute, a federal criminal statute. The other thing, it was decided before Loper Bright and before some of the recent statutory interpretation case law from the Supreme Court, and it relies on the legislative history for that particular statute in reaching its conclusion. We would say Marmolejo is inapposite here. The last point that I want to make is just in relation to the receiver receiving federal funds, and I think at page 10 of their answering brief, they kind of go through the different federal funds that are awarded. I just want to kind of clean up the record on this point. They explain that the federal funds that the receiver is getting comes from Safe Drinking Water Act grants, EPA state and tribal assistance grants, U.S. Army Corps of Engineers Water Resources Development Act grants, and American Rescue Plan Act funds. So those programs, American Rescue Act, Water Resources Development Act, those might be federal assistance programs, but the receiver's rate schedule, which is municipal, is not. Thank you, Your Honors. All right. Mr. Matheny for a vote. Thank you, Your Honor. Really fast. Three points. First, on this standard of review, I think it's being framed as a standard of review issue, but really, I mean, I think that the key principle here is that if it's illegal to disclose the SNAP data, if that violates federal law, then the district court had no discretion to consider equitable reasons to release it. I mean, that's the grab amount of what's at issue here. So you can talk about statutory interpretation, de novo, abuse of discretion in this, but the key thing is you interpret the statute. If the statute makes disclosure illegal, then the district court had no discretion to order the state to turn it over. Second thing is this, on the jurisdictional points that were brought up toward the end. On the 1292A1 issue, the statutory jurisdiction and the serious harm or important issue, I think that my friend's argument is kind of like, and assume we win, then there's no jurisdiction type of argument. Because I think he has to be right on the statutory merits question in order to be able to try to prove that there's no harm to the state. That's not really how the test works, as I appreciate it. The way I think that it works is, is there a serious harm or important issue at issue, and that's what triggers the ability to make an appeal under 1291A2. We definitely qualify here. We could lose all of our SNAP funding. We could lose all of our funding. I understated it in my brief. It's $70 million a month, not $70 million a year. It's 300,000 Mississippians that could suffer if this is wrong. While I appreciate my friend's point that, hey, if we have a federal court order that resolves this with the federal government, as a party, with the EPA, everybody else, look at what's been happening with federal assistance funds. It's hard for the state to feel very confident about risks at play here, and this has been something that's been going on for two administrations. It started under the last administration, and now here we are in a new one. Thank you, Your Honors. Thank you, Mr. Matheny. Your case and all of today's cases are under submission, and the Court is in recess until 9 o'clock tomorrow.